# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### SEPTEMBER 1999 SESSION



**FILED**

**December 17, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **NO. W1998-00500-CCA-R3-CD** |
| Appellee, | ) | |
| | ) | **HENRY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. JULIAN P. GUINN,** |
| **PEDRO DAVID VALLEJO,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First Degree Murder) |

**FOR THE APPELLANT:**

**D. D. MADDOX**
19695 East Main Street
P. O. Box 827
Huntingdon, TN 38344-0827

**FOR THE APPELLEE:**

**MICHAEL E. MOORE**
Solicitor General

**R. STEPHEN JOBE**
Assistant Attorney General
Cordell Hull Building, 2nd Floor
425 Fifth Avenue North
Nashville, TN 37243-0493

**ROBERT "GUS" RADFORD**
District Attorney General

**STEVEN L. GARRETT**
Assistant District Attorney General
P. O. Box 94
Paris, TN 38242

**OPINION FILED: _____**

**AFFIRMED**

**JOE G. RILEY, JUDGE**

**O P I N I O N**

Defendant, Pedro David Vallejo, was convicted by a Henry County jury of first degree murder and received a sentence of life imprisonment. In this appeal as of right, he presents the following issues for our review:

1. Whether the trial court erred in denying his request for appointment of a psychiatric expert relating to his claim of diminished capacity; and

2. Whether the trial court erred in refusing his request for a special jury instruction relating to the culpable mental state for first degree murder.

After a thorough examination of the record, we find no merit to either issue and **AFFIRM** the judgment of the trial court.

**FACTS**

Although defendant does not challenge the sufficiency of the evidence, an examination of the underlying facts is necessary to place the issues in proper perspective.

The state's proof established that at approximately 11:00 p.m. on July 21, 1997, Tex Hay, was performing his duties as manager of the Dollhouse, a strip club. The defendant entered the establishment, proceeded directly to the victim, cursed and argued with him, and stated, "I'm not taking any more of your f_ _ _ing s_ _ _." The defendant knocked the victim to the floor. Although the victim had a gun on his person, he never displayed the weapon. The defendant pulled a "butterfly" knife from his pocket and, while straddling the victim, stabbed him numerous times in the chest area. The defendant then threw his knife aside, apologized to others in the club, and stated that he did not intend to harm anyone else.

The defendant remained at the scene and was interviewed by an officer. He admitted that he stabbed the victim. He stated that earlier that night he was at another club in the area, returned to his residence, and then drove to the Dollhouse. During the approximate 25-minute drive from his residence to the Dollhouse, defendant determined that he would kill the victim due to problems the victim had

2

caused the defendant and his family.

The autopsy revealed that the victim received ten stab wounds to his chest and shoulder. He also had defensive wounds on his forearm and hand. The victim bled to death as a result of the stab wounds.

The defendant testified at his trial that his sister had worked at the Dollhouse and had a romantic relationship with the victim. At one time, the victim lived with defendant's sister and the defendant. The victim's relationship with defendant's sister was very stormy, and eventually they stopped living together. Defendant testified that the victim then began to harass and threaten his sister, her children, and the defendant. The defendant discovered that the victim hired a private investigator to follow him and his sister, and attempted to hire two different "hit men" to kill them. According to defendant, the victim also falsely accused him and his sister of stealing certain bonds from the victim.

The defendant further testified that on the night of the homicide, he had been at another strip club where his girlfriend was a dancer. She advised the defendant that the victim had raped her when she worked at the Dollhouse. Defendant then left the club, returned to his residence and changed clothes. He intended to return to the club where his girlfriend was, but while en route, decided to kill the victim and went to the Dollhouse. Defendant admitted confronting the victim, knocking him down, straddling him and stabbing him numerous times. Defendant stated he was "violently mad" due to all the past problems with the victim.

Defendant called numerous witnesses to corroborate his testimony concerning prior problems with the victim. Defendant's sister corroborated defendant's testimony. Two witnesses testified that the victim offered them money to kill and/or harm the defendant, his sister and her children. A Henry County psychiatrist testified that while defendant's sister was his patient, the victim became upset and threatened the psychiatrist, defendant's sister and her children. Defendant's girlfriend verified that shortly prior to the homicide, she informed the defendant that the victim had raped her. A private investigator verified that the victim contacted him to locate the defendant and his sister, and that the victim

3

advised him that he was apprehensive of the defendant and needed protection. Witnesses also indicated that defendant's sister obtained an order of protection against the victim, and the victim was known to carry a pistol and had fired it at alleged criminal intruders.

Based upon the evidence introduced at trial, the jury convicted the defendant of premeditated first degree murder.

## DENIAL OF PSYCHIATRIC EXPERT

Defendant contends the trial court erred in denying his pre-trial request for a state-funded psychiatric expert to establish his "diminished capacity" relating to first degree murder. We respectfully disagree.

### A. Pre-Trial Hearing

Defendant sought and received an *ex parte* pre-trial hearing seeking the appointment of an expert to establish diminished capacity. Defendant had already been evaluated by the team at Middle Tennessee Mental Health Institute who concluded: (1) defendant was competent to stand trial; (2) defendant did not meet the criteria for an insanity defense; (3) there was "no indication of a mental illness that might contribute to the matter of a diminished capacity;" and (4) defendant did not meet the standards for judicial commitment.

The defendant testified at the *ex parte* hearing. Consistent with his trial testimony outlined above, defendant detailed his prior problems with the victim. In light of these circumstances, he contended that "enough was enough," and he lost "proper judgment."

Defense counsel contended the circumstances established that the defendant experienced a "sudden rage during a temporary state of mental illness," thereby establishing the diminished capacity to form premeditation.

The trial court noted that the prior mental evaluation found no indication of a mental illness to support diminished capacity, and further noted that defendant

4

had not met his burden of establishing a "particularized need" for appointment of another expert. The trial court then denied the request.

## B. Standard of Review

The due process requirements for appointment of expert assistance for an indigent defendant in non-capital cases is controlled by State v. Barnett, 909 S.W.2d 423 (Tenn. 1995). Before such an appointment is necessary, the defendant must make a "threshold showing of particularized need," which requires a showing that the "psychiatric expert is necessary to protect his right to a fair trial." *Id.* at 431. Whether a defendant has made such a threshold showing must be determined on a case-by-case basis from an examination of all the facts and circumstances. *Id.* The trial court's ruling on the necessity for an expert will be upheld absent an abuse of discretion. Ruff v. State, 978 S.W.2d 95, 101 (Tenn. 1998).

"[P]sychiatric testimony must demonstrate that the defendant's inability to form the requisite mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997).

We agree with the state's argument that there was no threshold showing of particularized need for expert assistance in order to protect defendant's right to a fair trial. Defendant's alleged provocation was fully developed by lay witnesses. The emotional state of the defendant based upon this alleged provocation is not a proper basis for appointment of an expert to establish diminished capacity. Hall, 958 S.W.2d at 690. Nevertheless, all facts concerning the alleged provocation were properly brought before the jury, and the trial court properly instructed the jury as to the required *mens rea* of premeditated first degree murder, second degree murder and voluntary manslaughter. The jury, as was its prerogative, concluded that the defendant had the capacity to commit premeditated first degree murder.

In this case, just as in Ruff and Barnett, the defendant had already received a full psychiatric evaluation at state expense. Courts are not required to find the defendant an expert who will support his theory of the case. Ruff, 978 S.W.2d at 101 (citing Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53, 66 (1985)).

5

Accordingly, we find no abuse of discretion in the trial court's denial of further expert assistance at state expense. This issue is without merit.

## SPECIAL REQUEST FOR JURY INSTRUCTION

Defendant contends the trial court erred in refusing to give the following requested jury instruction:

> I further charge you that if you find after a consideration of all the evidence in the case that the defendant was suffering from a brief episode of rage during a temporary state of mental illness, then you cannot find that he had the culpable mental state or *mens rea* or intent to form the premeditation required to convict him of first degree murder.

We respectfully disagree with defendant's contention and conclude that the trial court's instructions fully and adequately covered the applicable law.

In requesting this instruction, the defendant relied upon language in State v. Hall, 958 S.W.2d 679, 691 (Tenn. 1997). However, defendant takes the language out of context. Although Hall states that "people could have brief episodes of rage during 'temporary states of mental illness,'" the Supreme Court was merely quoting from the testimony of an expert. *Id.* In fact, the Supreme Court went on to specifically declare that while evidence that a particular defendant, because of a mental disease or defect, lacks the capacity to form the requisite intent is admissible in Tennessee, expert testimony about the typical reactions of certain personality types is not relevant to the capacity to form the culpable mental intent. *Id.*

There was no evidence to indicate that the defendant suffered from a mental disease or defect. Further, the trial court correctly instructed the jury on the appropriate *mens rea* elements of first degree murder, second degree murder and voluntary manslaughter. These instructions correctly and adequately covered this issue. *See generally* State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *see also* State v. Grose, 982 S.W.2d 349, 353-54 (Tenn. Crim. App. 1997)(finding no error in the trial court's refusal to give a specific charge on diminished capacity).

This issue is without merit.

## CONCLUSION

Based upon our review of the record, the judgment of the trial court is **AFFIRMED** in all respects.

_____
**JOE G. RILEY, JUDGE**

**CONCUR:**

_____
**DAVID G. HAYES, JUDGE**

_____
**THOMAS T. WOODALL, JUDGE**